### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DE LAGE LANDEN FINANCIAL SERVICES, INC.,**<br><br>    Plaintiff,<br><br>**v.**<br><br>**QC LABS**,<br>    Defendant/Crossclaim Defendant<br><br>**and**<br><br>**TYLER AUTERA and BRIAN LANNON,**<br>    Defendants and<br>    Cross Claimants/Third-Party Plaintiffs,<br><br>**v.**<br><br>**ERIC NICOLAIDES, MATTHEW FRIEDHOFF, and WC BIO AG HOLDINGS, LLC**<br>    Third-Party Defendants. | **CIVIL ACTION NO. 22-2512** |

### MEMORANDUM RE: MOTION TO VACATE

Baylson, J.                                                    December 15, 2023

Crossclaim Defendant QC Labs ("QC") moves to vacate an adverse default judgment in favor of Cross-claimants Tyler Autera and Brian Lannon ("Guarantors"), entered by this Court in May 2023. QC now argues this default judgment is void because Guarantors failed to properly serve QC. QC alternatively argues this Court should vacate the judgment on the grounds of excusable neglect. For the reasons explained below, QC's motion is **DENIED**.

### I.    BACKGROUND

This case has a long and complicated procedural history. As that history bears directly on QC's present motion to vacate, the Court reviews it in some detail.

1

**A.  DLL Sues QC, Lannon, and Autera in the Court of Common Pleas**

In February 2022, Plaintiff De Lage Landen Financial Services, Inc. ("DLL") filed an action in the Chester County Court of Common Pleas against Defendants QC, Autera, and Lannon, seeking payment for equipment that DLL had leased to QC.  ECF No. 63-2 at 6.  In that Complaint, DLL alleged that QC failed to pay for this equipment, which amounted to (1) a breach of contract and (2) unjust enrichment.  ECF No. 1 at 11–15.  DLL further alleged that Autera, then-COO of QC, and Lannon, then-CEO of QC, had agreed to personally guarantee QC's equipment lease obligations.  Id. at 16–17; ECF No. 63-2 at 6.  Accordingly, DLL brought separate breach of contract claims against both Autera and Lannon in this same Court of Common Pleas action.  ECF No. 1 at 16–17.

**B.  DLL Attempts to Serve QC**

DLL purported to serve its Complaint on QC on February 15, 2022, via process server Bryan Canas.  ECF No. 64-1 at 2; ECF No. 64-2 at 43.  Canas's affidavit of service states that he served the relevant documents on "QC Labs" by leaving copies "with a person authorized to accept service, e.g., managing agent, registered agent, etc." at "17322 Murphy Avenue, Irvine, California 92614."  ECF No. 64-2 at 43.  Canas further avers he left the papers with "Ashley Curle," a "Community Mgr."  Id.  According to QC, this address—which QC listed as its "billing address" in the underlying equipment lease, ECF No. 64-2 at 21—was a "virtual office that QC Labs used merely as a mailing address," at which "QC Labs had no physical office space or employees present."  ECF No. 66 at 7.  Moreover, Curle herself was not a QC employee, but instead an employee of WorkWell, the shared office space at this location.  Id.  While Guarantors do not contest Curle's status as a non-employee of QC, Cross-claimant Lannon avers that—at least while he controlled QC—"QC not only received mail at this address, [but also] regularly conducted

meetings there." ECF No. 69-1 at 2–3.  Lannon further avers that "QC's registration with the State

of California gives 17322 Murphy Road, Irvine California as its Principal Executive Office."  Id.

On April 1, 2022, DLL's counsel received an email from Jason Moore-Brown, the CEO of

"Cannalysis."  ECF No. 64-1 at 2.  Among other things, this email requested a "continuance" on

the Court of Common Pleas action.  Id.  DLL's counsel also then spoke with Moore-Brown on the

phone, during which Moore-Brown stated that he was the interim CEO of QC,[1] that QC was going

to be sold soon, and that the purchasers were interested in settling QC's debt to DLL.  Id. at 2–3.

### C.  DLL Wins a Default Judgment Against QC in the Court of Common Pleas

Despite these behind-the-scenes conversations, QC never responded or entered an

appearance in the Court of Common Pleas.  As such, the Court of Common Pleas entered a default

judgment of approximately $215,000 in DLL's favor and against QC on April 15, 2022.  ECF No.

63 at 1; ECF No. 64-2 at 47–48; ECF No. 32-1 at 3–4.  Notably, QC eventually made a payment

of $100,000 to DLL on or around June 15, 2022, ECF No. 64-3 at 11–21, doing so in the hopes

that DLL would "hold all litigation" and "pause" all remaining "enforcement activities," id. at 11,

16–17.  Indeed, in email correspondence between DLL and QC regarding the effect of that

$100,000 payment on DLL's remaining claims, Eric Nicolaides, QC's subsequent owner,[2]

expressly stated that he "know[s] Brian [Lannon] was served" and that Lannon was "requesting

the company indemnify him," but that Nicolaides would "<u>rather give [DLL] money than to spend

money filing a response</u>."  Id. at 11 (emphasis added).

---

[1] The record makes clear that, for some period of time, QC was doing business as Cannalysis.

[2] Nicolaides was the owner of WC Bio, which acquired a controlling stake in QC Labs in May 2022.  ECF No. 63-3 at 3. Further, as explained below, Matthew Friedhoff served as QC's president upon WC Bio's purchase.  ECF No. 20 at 22–23.  WC Bio, Nicolaides, and Friedhoff eventually became Third-Party Defendants in this case.

**D.  Guarantors Remove to Federal Court and File Cross and Third-Party Claims**

On June 27, 2022, Guarantors then removed this case to federal court, pursuant to 28 U.S.C. § 1332 and § 1441.  See ECF No. 1 (Notice of Removal, attaching DLL's Complaint).  In July 2022, Autera filed an Answer to DLL's Complaint, which also brought several Crossclaims against QC.  ECF No. 9.[3]  According to Guarantors, "QC through its 'in-house' counsel," then contacted Guarantors' counsel, "confirming that he had received copies of the pleadings, and requested an extension of time through August 19, 2022 to answer, which [Autera agreed to] through September 1, 2022."  ECF No. 65-1 at 3; see also ECF No. 65-2 at 5 (August 11, 2022 email from QC's counsel acknowledging "the cross-claim filed by Tyler Autera").  Guarantors' counsel then conditionally agreed to an additional extension on August 30, 2022.  ECF No. 65-1 at 3.  At that point, QC's counsel again contacted Guarantors' counsel, this time announcing QC's intention "to attack the default judgment obtained by DLL against QC, and request[ing] the cooperation of Autera and Lannon."  ECF No. 65-1 at 3.  Indeed, the record reflects that on September 19, 2022, QC's counsel—hoping to make DLL "more willing to negotiate"—emailed Guarantors' counsel and raised many of the same service-of-process arguments it does here, albeit with respect to DLL's initial default judgment.  ECF No. 65-2 at 7–9.

On October 21, 2022, Guarantors then jointly filed, in a single continuous document, (1) an Amended Answer to the DLL Complaint; (2) Amended Crossclaims against QC; and (3) a Third-Party Complaint against Third-Party Defendants Eric Nicolaides, Matthew Friedhoff, and

---

[3] As explained in more detail below, all claims between DLL and Autera/Lannon eventually settled in May 2023.  See ECF No. 51.  Thus, apart from the default judgment in favor of Guarantors and against QC, which QC now seeks to reopen, all claims, cross-claims, and third-party claims among all parties in the case have settled or been voluntarily dismissed.

4

WC Bio AG Holdings.  ECF No. 20.  As relevant here, Guarantors' Amended Crossclaims against

QC sought the following:

- **Count 1**: Indemnification from QC—per an existing indemnification agreement between QC and Guarantors—for damages and expenses related to not only the DLL action, but also two separate creditors of QC: (a) QC's California landlord and (b) the Ford Motor Company, which had leased vehicles to QC;

- **Count II**: Damages for QC's unjust enrichment at Guarantors' expense by selling QC assets while refusing to pay off company debts; and

- **Count III**: Declaratory relief affirming that the parties' indemnification agreement requires QC to advance expenses and pay all damages suffered by Guarantors for claims arising from a QC creditor.  ECF No. 20 at 14–21.

### E. Guarantors Attempt to Serve QC Personally and by Mail

Guarantors purported to serve their Amended Crossclaims in two ways.  First, Guarantors

attempted to serve QC on October 21, 2022 by sending the papers—via "regular" mail—to the

WorkWell location.  ECF No. 20-4.  Second, and similar to DLL's purported service of the original

Complaint, Guarantors attempted to serve QC on November 3, 2022, again via process server

Bryan Canas.  ECF No. 23.  Like Canas's service efforts on behalf of DLL, his Return of Service

form on behalf of Guarantors, filed on November 7, 2022, avers that he served the papers

"personally upon the defendant . . . QC Labs" at 17322 Murphy Avenue, and that the papers were

"[a]ccepted by. . . Rachel Speights," a "Manager" at that address.  Id.[4]

### F. Guarantors Win a Default Judgment Against QC

Much like its failure to respond to DLL in the Court of Common Pleas action, QC failed

to file a response pleading or otherwise defend against Guarantors' Crossclaims in this Court.  ECF

No. 31 at 2.  As a result, this Court entered a default in Guarantors' favor and against QC in

---

[4] Luis Mesa, a different process server, purported to effectuate service on Third-Party Defendants Nicolaides and WC Bio shortly thereafter.  ECF Nos. 24, 25.  Third-Party Defendant Friedhoff, as discussed in further detail infra, agreed to waive service in March 2023.  ECF No. 40.

December 2022, ECF No. 28, and eventually entered a default judgment in the amount of $250,000 in May 2023, ECF No. 50. As discussed at oral argument on May 4, 2023, this Court's default judgment exclusively addressed $250,000 in unpaid rent that QC had owed to the landlord of its California laboratory (i.e., a creditor other than DLL), and thus did not actually involve indemnification for QC's failure to pay DLL for the leased equipment. ECF No. 60 at 6–7; ECF No. 31 at 3. The California landlord had brought an action against Lannon and Autera in California, predicated on Lannon and Autera's respective guarantees for QC's lease of the laboratory. ECF No. 32-2 at 2. The parties eventually settled that action for $250,000 in January 2023. Id. at 2. Lannon and Autera paid the settlement sum, but did so by means of promissory notes from their fathers. Id. at 10–14.

### G. All Remaining Claims Settle or are Voluntarily Dismissed, after which QC Moves to Vacate Default Judgments

Because this default judgment in favor of Guarantors and against QC did not require QC to indemnify Guarantors for DLL's claims against Guarantors (i.e., the portion of **Count I** of Guarantors' Amended Crossclaims against QC related to DLL's equipment lease), DLL then immediately settled its outstanding claims with Guarantors. ECF No. 60 at 6–7. Thus, following subsequent voluntarily dismissals and settlements by Third-Party Defendants on all claims in June 2023, ECF Nos. 55, 59, this case appeared to be over.

Then, on August 24, 2023, QC entered its first appearance and filed the present motion to vacate both DLL's and Guarantors' adverse default judgments. ECF No. 63.[5]

---

[5] QC has since withdrawn its motion to vacate DLL's default judgment, and so only QC's challenge to Guarantors' default judgment remains.

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 55(c) provides that "the court may set aside an entry of default for good cause, and it may set aside a final default judgment under Rule 60(b)."  Fed R. Civ. P. 55(c).  Rule 60(b), in turn, provides that "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding" if, among other reasons, (1) it flows from a "mistake, inadvertence, surprise, or excusable neglect," (2) "the judgment is void," or (3) for "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(1), (4), (6).  Critically, "[a] default judgment entered when there has been no proper service of the complaint is, a fortiori, void, and should be set aside."  Longenette v. Krusing, 322 F.3d 758, 765 (3d Cir. 2003) (citation omitted).

When a default judgment is not void, however, the Court retains "broad discretion" in deciding whether to set it aside.  Momah v. Albert Einstein Med. Ctr., 161 F.R.D. 304, 307 (E.D. Pa. 1995).  Moreover, the Third Circuit has made clear that district courts should "not favor default judgments and in a close case, doubts should be resolved in favor of setting aside the default and reaching the merits."  Zawadski de Bueno v. Bueno Castro, 822 F.2d 416, 420 (3d Cir. 1987).   In exercising that discretion, this Court relies on a three-factor test: "(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; and (3) whether the default was the result of the defendant's culpable conduct."  Gold Kist, Inc. v. Laurinburg Oil Co., 756 F.2d 14, 19 (3d Cir. 1985).

### III.   PARTY CONTENTIONS

#### A.  QC's Contentions

QC raises two arguments in moving to vacate this Court's default judgment against QC and in favor of Guarantors.  ECF No. 63.[6]  First, QC contends that service of process was insufficient and thus the judgment is void.  ECF No. 63-2 at 11 (citing to Gold Kist, Inc., 756 F.2d at 19).  Second, QC argues that, even if service was proper, this Court should vacate the default judgment on the grounds of excusable neglect.  Id. at 18.

####    i.   Guarantors' In-Person Service Attempt

QC asserts that "Rachel Speights"—the "manager" listed on Guarantors' affidavit of service—was not authorized to accept service on behalf of QC under the Federal Rules or the applicable procedural rules of Pennsylvania and California, which are relevant here as the states where this Court sits and where Guarantors attempted service.  ECF No. 63-2 at 12–13, 17 (citing to Fed. R. Civ. P. 4(e)(1)).  As a WorkWell employee, QC argues, Speights was not an "officer, a managing or general agent, or any other agent authorized by appointment" for QC, and was therefore not a proper target for service under the Federal Rules.  Id.  Likewise, under Pennsylvania law, Speights was not "(1) an executive officer, partner or trustee of the corporation or similar entity, . . . (2) the manager, clerk or other person for the time being in charge of any regular place of business or activity of the corporation or similar entity, or (3) an agent authorized by the corporation or similar entity in writing to receive service of process for it."  Id. at 13, 17 (citing to Pa. R. Civ. P. 424).

---

[6] As noted above, while QC's  motion simultaneously seeks to vacate the default judgment in favor of DLL, QC has since withdrawn that portion of the motion.

Finally, under California law, Speights was not (a) "designated as agent for service of process . . .; [or] (b) . . . the president, chief executive officer, or other head of the corporation, a vice president, a secretary or assistant secretary, a treasurer or assistant treasurer, a controller or chief financial officer, a general manager, or a person authorized by the corporation to receive service of process." Id. at 13, 17 (citing to Cal. Civ. Proc. Code § 416.10).

QC also contests the validity of Guarantors' initial service efforts via regular mail. Id. at 16–17. QC argues, in relevant part, that "[t]he Federal Rules of Civil Procedure do[] not contemplate service of a corporation by mail . . . , and service of a corporation in this manner does not meet the requirements under Pennsylvania or California law." Id. at 16. According to QC, proper service by mail in either state requires (1) the use of restricted, certified, or first-class mail and (2) written acknowledgment of receipt by the defendant or an authorized agent. Id. at 16–17. Here, QC contends, Guarantors "do not provide proof of completion of the requirements under the Pennsylvania or California rules or even claim that these steps were satisfied," thus rendering the attempted service-by-mail plainly insufficient. Id. at 17.

ii. QC's Excusable Neglect Argument

QC further asserts that, even if service was proper, this Court should nonetheless vacate the default judgment on the grounds of "excusable neglect," as all three relevant factors weigh in its favor. Id. at 18. First, QC argues that Guarantors' default judgment was entered just a few short months ago, and this minor delay, without more (e.g., loss of evidence), would not prejudice Guarantors. Id. at 18–19. Second, QC contends it has numerous meritorious defenses against Guarantors' claims, as (1) the landlord guaranty agreements on which Guarantors premise their claim do not fall within the sweep of Guarantors' indemnification agreement with QC, given that Lannon and Autera supposedly entered these guaranty agreements in their personal capacities,

9

whereas the indemnification agreement applies only to Guarantors' obligations as QC officers, (2) both the guaranty agreements and the indemnification agreement contain exclusive forum selection clauses requiring litigation in California, and (3) even if this Court could hear this claim, the indemnification agreement makes clear that Guarantors' rights to indemnification only spring to life after Guarantors have actually incurred losses or made a payment, which they have not.[7]  Id. at 19–25.  Third, QC asserts that it "did not evade service in any way or have ample notice of the complaint and intentionally decide not to respond," and is therefore not culpable for its failure to timely answer.  Id. at 26 (quotations omitted).  QC instead claims that it was "confused" as to whether it was properly served at a time when the company was essentially "defunct," which justifies its lack of action.  Id. at 25.

### B.  Guarantors' Contentions

#### i.   Guarantors' Service Attempts

Guarantors respond, asserting they "served QC by personal service at 17322 Murphy Avenue, Irvine CA 92614 on November 3, 2022."  ECF No. 65-1 at 3.  In support of that argument, Cross-claimant Lannon avers that—at least during his tenure as QC's CEO—QC not only received mail at this address, but also regularly conducted meetings there and used that address on credit applications and other business documents.  ECF No 69-1 at 2–3.  Lannon further avers that staff at this location "were authorized to accept all deliveries on behalf of QC Labs," with "mail pick up [] done by the QC Labs office manager, a receptionist, or Matt Friedhoff, and was conveniently located near QC's working laboratory."  ECF No. 69-2 at 3.

---

[7] On this final defense, QC asserts that Guarantors' respective parents, rather than Guarantors themselves, satisfied the outstanding rent obligations for which the default judgment provides indemnification.  Id. at 24.

Guarantors likewise contend that "QC was also put on notice by emails to its in-house counsel and by sending copies of pleadings via regular mail," ECF No. 65-1 at 3, and that "actual notice of said service" is "demonstrated by email communications between QC's in-house counsel and QC's actual executives at the time." Id. That notice, Guarantors argue, was sufficient to confer this Court with jurisdiction, particularly when viewed in combination with Guarantors' multiple good-faith service attempts here.

### ii.   QC's Excusable Neglect Argument

Guarantors next argue—assuming their service efforts were sufficient—that each of QC's excusable neglect arguments lack merit. First, Guarantors assert that nothing about QC's failure to respond was excusable, as QC was "both properly served and actually aware of this litigation," yet chose not to respond for strategic purposes. ECF No. 65-1 at 4. Second, Guarantors argue that QC cannot mount a meritorious defense to Guarantors' indemnifications claims. Specifically, Guarantors contend the indemnification agreement was enforceable here because it was "approved by the officers and/or board of directors of QC at the time" and applies to the lease guaranty because Guarantors entered into the latter in their corporate capacity. Id. at 4–5. Guarantors also argue that, to the extent the various forum selection clauses here are enforceable, QC has waived the right to rely on those clauses at this late stage. Id. at 4. Lastly, Guarantors contend that granting QC's motion here would be "highly prejudicial," given that "Lannon and Autera both invested substantial time and energy" in litigating this case and obtaining a default judgment. Id. at 4, 6.

## IV.     DISCUSSION

Federal Rule of Civil Procedure 4(h) provides that where, as here, service must be effectuated upon a corporation, a party may do so

> (A) in the manner prescribed by Rule 4(e)(1) for serving an individual; or

> (B) by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and--if the agent is one authorized by statute and the statute so requires--by also mailing a copy of each to the defendant.

Fed. R. Civ. P. 4(h)(1)(A)–(B).  Rule 4(e)(1), in turn, provides that service may be effectuated by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."  Fed. R. Civ. P. 4(e)(1).

Thus, the Court's analysis proceeds as followings.  First, the Court considers whether service was proper under the (1) Federal Rules, (2) Pennsylvania law, as the state where this District Court is located, and (3) California law, as the state where service was attempted.  Then, in the event the Court finds jurisdiction was proper, it next considers whether QC's "excusable neglect" argument nonetheless warrants vacating Guarantors' default judgment.

For the reasons explained below, the Court is satisfied that (1) Guarantors properly effectuated service here, and (2) QC cannot sufficiently demonstrate "excusable neglect."

### A.  Federal Rule of Civil Procedure 4(h)(1)(B)

The Federal Rules, as just noted, provide a standalone method for serving corporations. Under Federal Rule 4(h), a party may do so "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process . . . ."  Fed. R. Civ. P. 4(h)(1)(B).  Whether an individual is a "managing or general agent" depends on "a factual analysis of that person's authority within the organization."  Gottlieb v. Sandia Am. Corp., 452 F.2d 510, 513 (3d Cir. 1971) (internal quotations

12

omitted).  In discerning if that authority exists, the Court considers whether a person "perform[s] duties which are sufficiently necessary to the corporation's operations and occup[ies] a position of sufficient responsibility so that it is reasonable to assume the individual will forward the summons and complaint to organizational superiors."  Hartsoe v. Kmart Retail Distribution Ctr., No. CIV. A. 99-429, 2000 WL 21263, at *2 (E.D. Pa. Jan. 13, 2000).

       i.   Speights was not Technically a QC Agent under Federal Rule 4(h)

Here, Speights does not appear to fit within any category of actor for which service is suitable under the Federal Rules.  Speights was an employee of a shared workspace, rather than QC itself.  Thus, she was not an officer of QC.  Likewise, nothing in the record indicates Speights was authorized by QC or by statute to accept service on behalf of QC, apart from QC designating the WorkWell location as a mailing address.  To the contrary, Eric Nicolaides, owner of QC's parent company, declared that "Rachel Speights was [not] at any time an employee, managing or general agent, registered agent, in charge of any of QC Labs' offices or places of business, or otherwise authorized to accept service on behalf of QC Labs."  ECF No. 63-3 at 2.

Nicolaides's declaration therefore also undermines Guarantors' contention that Speights was a "manag[ing] or general agent" for QC.  ECF No. 64-1 at 4.  True, the inquiry is ultimately a factual one, and so this Court cannot blindly rely on Nicolaides's ex-post statements.  Nonetheless, the record reflects that Speights was a non-QC employee responsible only for a shared workspace where—by the time of Guarantors' attempted service—"QC Labs did not have a physical office or any employees working."  ECF No. 63-3 at 2.

As QC correctly notes, the Third Circuit has routinely rejected service attempts on individuals with closer organizational ties than the WorkWell employees here.  In Gottlieb, for instance, the Third Circuit held as improper service upon the co-defendant of a corporation who

was also the corporation's controlling stockholder and who had knowledge of the transaction central to the suit.  Gottlieb, 452 F.2d at 513.  Likewise, in Gabros v. Shore Med. Ctr., the Third Circuit denied as improper service upon both an "administrative assistant" and a "risk manager" who worked at the medical center facility-defendant, both of whom were actually employed by that medical center.  724 F. App'x 119, 122 (3d Cir. 2018) (non-precedential).  Perhaps most on point, in Grand Ent. Grp., Ltd. v. Star Media Sales, Inc., the Third Circuit found service improper where the plaintiff "served process on a receptionist who did not work in the offices of the [] defendants and was not employed by them," but was instead "a building employee who took messages for tenants while they were out of the office."  988 F.2d 476, 485 (3d Cir. 1993).[8]

     ii.   QC's Considered Decision not to Respond Undermines its Motion

While Guarantors do not concede the impropriety of their service efforts here, they do not directly counter QC's various technical arguments and the precedents cited above.  Instead, Guarantors hang their hats on QC actual notice of Guarantors' Amended Crossclaims, in combination with QC's purposeful decision not to respond to these Crossclaims.  ECF No. 65-1 at 3.  For the reasons explained below, that argument is persuasive.

Simply put, Third Circuit precedent clearly dictates that where, as here, a defendant makes a "considered decision to allow the entry of the default judgment," despite that defendant's actual notice of a suit, that "tactic as a matter of strategy" requires the defendant to "live with its consequences."  Wells v. Rockefeller, 728 F.2d 209, 214 (3d Cir. 1984).  Indeed, when "a

---

[8] See also Alloway v. Wain-Roy Corp., 52 F.R.D. 203, 205 (E.D. Pa. 1971) (finding service on employee of defendant corporation insufficient, explaining that "[t]he mere fact that he is designated as a 'manager' on the return does not indicate that he was clothed with the responsibility envisioned by the Federal or Pennsylvania rules as a proper person to receive service"); Miller v. Aldecocea, No. 23-CV-00409, 2023 WL 4534591, at *4 (E.D. Pa. July 13, 2023) ("an individual who is physically present at a business location does not constitute by default an officer or agent"); McKinnis v. Hartford Life, 217 F.R.D. 359, 361 (E.D. Pa. 2003) (similar).

defendant's failure to respond" is "malicious or strategic, the court will refuse to vacate the default judgment," even if service was not technically properly effectuated. <u>Walsh v. SmithKline Beckman</u>, No. CIV. A. 89-5833, 1990 WL 76460, at *3 (E.D. Pa. June 6, 1990).

The Third Circuit's decision in <u>Wells v. Rockefeller</u> is most on point.  As such, the Court reviews it in some detail.  In <u>Wells</u>, lessor-plaintiff brought a possessory action against lessee-defendant.  728 F.2d at 211.  Lessee did not answer the complaint, but instead brought a separate suit against lessor for fraud.  <u>Id.</u>  Lessor obtained a default judgment in the possessory action, after which lessee's separate fraud suit was dismissed for failure to bring that fraud claim as a compulsory counterclaim in the possessory suit.  <u>Id.</u>

On appeal, lessee argued that the district court did not have jurisdiction to enter a default judgment because lessor failed to properly serve lessee.  <u>Id.</u> at 213.  The Third Circuit rejected this claim, despite a finding that "efforts to secure personal service on [lessee] were unsuccessful."  <u>Id.</u> at 212.  Crediting lessee's "conce[ssion] that he received a copy of the summons and complaint," <u>id.</u>, the Third Circuit ultimately affirmed the default judgment in view of lessee's "considered decision to allow the entry of the default judgment," <u>id.</u> at 214.   Specifically, the Court explained that lessee "followed this tactic as a matter of strategy; that being so, he must now live with its consequences."  <u>Id.</u>; <u>see also</u> <u>id.</u> at 212 (explaining that "there was no mistake by [lessee's] attorney. Rather, the failure to respond to either the complaint or the motion to enter a default was voluntary and intentional and an essential part of his strategy to permit a default judgment") (citations and quotations omitted).[9]

---

[9] Similarly, the district court—in initially upholding the default judgment—noted that "one is left with the inescapable notion that [lessee] waited far too long to assert whatever rights he possessed, and then retained an ingenious and innovative attorney who made a valiant attempt to resuscitate the [lessee's] claim, to no avail."  <u>Fountain Valley Corp. v. Wells</u>, 19 V.I. 607, 622 (D.V.I.

Likewise, in Walsh, defendant-corporation moved to vacate an adverse default judgment on a an employment discrimination claim, alleging inadequate service of process under Fed. R. Civ. P. 60(b).  Walsh v. SmithKline Beckman, No. CIV. A. 89-5833, 1990 WL 76460, at *1 (E.D. Pa. June 6, 1990).  Plaintiff had made several attempts to serve defendant-corporation at its offices, with service ultimately "made [] and accepted . . by [defendant's] paralegal."  Id.   Critically though, defendant conceded that—following plaintiff's service upon defendant's paralegal—defendant's "inhouse counsel promptly contacted outside counsel . . . to handle the case."  Id. Defendant further "admit[t]ed that [outside counsel] proceeded to gather the information necessary to prepare an Answer and to defend against [plaintiff's] claim."  Id.

Nonetheless, defendant argued, as QC does here, that service was "defective . . . because it was served on a paralegal who was not an 'officer, a managing or general agent, or . . . other agent authorized by appointment or by law to receive service of process,'" id. at *2 (citing to  Fed. R. Civ. P. 4(d)(3)), thus requiring the district court to vacate the default judgment.   Judge Newcomer rejected this argument, concluding instead that "[a]lthough the aforementioned services were technically defective," they were "clearly sufficient to generate activity within [defendant's] headquarters," and thus "under equitable principles," defendants had "waived their right to assert a defense that service of process was insufficient in this matter."  Id.  Judge Newcomer further explained that when a "defendant's failure to respond [is] malicious or strategic, the court will refuse to vacate the default judgment."  Id. at *3 (citing to Wells v. Rockefeller, 728 F.2d 209 (3rd

---

1983), aff'd sub nom. Wells v. Rockefeller, 728 F.2d 209 (3d Cir. 1984).  In many ways, that sentiment mirrors the present suit.

Cir.1984); <u>Brand v. NCC Corp.</u>, 540 F.Supp. 562 (E.D.Pa.1982); <u>American States Ins. Co. v.</u> <u>Bennett</u>, 102 F.R.D. 102 (W.D.Pa.1984)).[10]

     This case is on all fours with <u>Wells</u> and <u>Walsh</u>.  While QC directs this Court to a litany of potential technical shortcomings with Guarantors' service efforts, the record here unequivocally reflects that those efforts not only resulted in QC's notice of Guarantors' suit, but also QC's literal receipt of Guarantors' Amended Crossclaims.  What's more, that record reveals that QC actively considered filing a response to both the actual Crossclaims and an earlier request for indemnification from Lannon, yet chose not to do so for strategic purposes (<u>i.e.</u>, efficiency, cost, or litigation strategy).  Indeed, on August 11, 2022—after Guarantors had removed to this Court and Autera had filed his original indemnification Crossclaim against QC—QC's counsel expressly acknowledged "the cross-claim filed by Tyler Autera" and sought an extension from Guarantors to file a response.  ECF No. 65-2 at 5.  Earlier, on June 15, 2022, Nicolaides stated that "Brian [Lannon] was served and he is requesting the company indemnify him," but that Nicolaides would "<u>rather give [DLL] money than have to spend money filing a response</u>."  ECF 64-3 at 11 (emphasis added).

     True, as QC's counsel pointed out at oral argument, these various correspondences occurred prior to Guarantors filing their joint Amended Crossclaim against QC and their Third-Party Complaint against WC Bio, Nicolaides, and Friedhoff.  ECF No. 20.  Nonetheless, these messages demonstrate that Guarantors' service efforts (and DLL's virtually identical efforts) were

---

[10] While Judge Newcomer ultimately determined, for other reasons, that there was "sufficient basis upon which [defendant] has demonstrated" excusable neglect, he expressly noted that "voluntary arrangements between the parties (<u>without</u> court approval) do not alter their responsibilities to the court under the Federal Rules of Civil Procedure and have no effect on the timeliness."  <u>Id</u>.

routinely "sufficient to generate activity" by QC.  Walsh, 1990 WL 76460, at *2.[11]   Indeed, apart

from QC counsel's September 19, 2022 message expressing doubt regarding DLL's service efforts

at the WorkWell location,[12] every correspondence from QC to DLL and Guarantors conveyed

precisely the opposite message.  Two successive QC CEOs and QC's in-house lawyer repeatedly

engaged with DLL, Guarantors, and their respective lawyers about this litigation, yet chose not to

contest DLL's or Guarantors' claims before this Court (or the Court of Common Pleas) until after

a default judgment.

The amalgamation of these correspondences enables this Court to conclude that QC's

subsequent "failure to respond" to Guarantors' Amended Crossclaims was a "malicious or

strategic" attempt to generate an out-of-court settlement and/or eliminate litigation costs, and so

this Court will "refuse to vacate the default judgment."  Walsh, 1990 WL 76460, at *3.  Simply

put, QC's "decision to gamble against th[e] eventuality [of a default judgment] does not justify

reopening the judgment in the circumstances of this case."  Wells, 728 F.2d at 214.

---

[11] Moreover, the Court reiterates that Guarantors sold QC to Third-Party Defendants Nicolaides and WC Bio on May 16, 2022.  ECF No. 63-3 at 3.  After that sale, Third-Party Defendant Friedhoff assumed the role of QC president.  ECF No. 20 at 23.  Critically, QC does not appear to contest that Friedhoff waived service on March 13, 2023, ECF No. 40, even if QC does contest the efficacy of that service for the purposes of the Amended Crossclaims.  In other words, QC's president acknowledged via waiver that he had received a summons and a copy of Guarantors' pleadings, for which this Court eventually granted default judgment.  Likewise, QC's briefing here expressly argues that QC declined to respond to Guarantors' Amended Crossclaims not because QC was unaware of those Amended Crossclaims, but instead because "QC Labs did not believe that service was valid."  ECF No. 63-2 at 25.  So both Friedhoff's waiver and QC's briefing admission further bolster this Court's conclusion that QC had notice of Guarantors' Amended Crossclaims and simply chose not to respond.

[12] A message which, again, QC's counsel sent specifically for the purpose of making DLL "more willing to negotiate."  ECF No. 65-2 at 7–9.

    iii.   <u>Actual Notice Made Service Proper under Federal Law</u>

Malicious and strategic behavior aside, numerous courts within this Circuit have more broadly concluded that minor "technical violations" do not undermine a plaintiff's good-faith service effort when a defendant actually receives a complaint.  <u>See, e.g.</u>, <u>Stout St. Funding LLC v.</u> <u>Johnson</u>, 873 F. Supp. 2d 632, 648 (E.D. Pa. 2012); <u>Constitutional Guided Walking Tours, LLC</u> <u>v. Independence Visitor Center Corp.</u>, 804 F.Supp.2d 320, 324–25 (E.D.Pa.2011) ("Rule 4 is a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint and technical defects do not justify dismissal") (citation omitted); <u>Nally v. New Jersey</u> <u>Manufacturers Ins. Co.</u>, No. CV 23-1144, 2023 WL 3674317, at *2–3 (E.D. Pa. May 25, 2023) ("a court is not deprived of personal jurisdiction by a technical defect in a summons when the error resulted in no prejudice") (citation and quotation omitted); <u>Stranahan Gear Co. v. NL Indus.,</u> <u>Inc.</u>, 800 F.2d 53, 56 (3d Cir.1986) ("When there is actual notice, every technical violation of the rule or failure of strict compliance may not invalidate the service of process") (citation omitted). Most notably, in declining to set aside a default judgment, Judge Kenney has previously explained

> Although a party may not ignore the rules, when there is actual notice, every technical violation of the rule or failure of strict compliance may not invalidate the service of process. [] The Summonses received by the [] Defendants named the court and all parties involved, listed the plaintiff's attorney and his address, directed Defendants to respond within twenty-one days, and was signed by the Clerk. The [] Defendants do not argue that they did not receive the Summons and Complaint or that they were prejudiced in any way. The [] Defendants received service, saw the technical defects, and chose not to act. They do not submit any affidavits that indicate otherwise.

<u>Stout St. Funding LLC</u>, 873 F. Supp. at 647 (quotations and citations omitted).

    This case, in most material ways, mirrors <u>Stout St. Funding LLC.</u>  QC is likely correct that Guarantors' service upon the manager of a shared office does not technically satisfy Rule 4, as explained above.  QC is also likely correct that Guarantors' initial mailing efforts were technically

insufficient, as nothing in the record indicates Guarantors' "regular" mailing method required a QC representative's signature, as is needed under all applicable law here.  See Fox v. Chipotle Mexican Grill, Inc., No. 2:20-CV-1448, 2021 WL 706757, at *2 (W.D. Pa. Feb. 23, 2021); see also Grant St. Grp., Inc. v. D & T Ventures, LLC, No. 10-CV-1095, 2011 WL 778438, at *2-3 (W.D. Pa. Mar. 1, 2011); Merritt v. JP Morgan, No. 17-CV-06101-LHK, 2018 WL 1933478, at *7 (N.D. Cal. Apr. 24, 2018).

Nonetheless, the circumstances here lead this Court to conclude that these various technical deficiencies should not undermine the Court's jurisdiction.  Guarantors made multiple good-faith service attempts at a location that QC held out—at different times—to be a "mailing address," a "billing address," a "Principal Executive Office" per QC's registration with the state of California, and a place where QC at one point "regularly conducted meetings [] and used on credit applications and other business documents."  ECF No. 69-1 at 2–3.  That Guarantors may have used the wrong type of mail-method or served a "manager" with insufficient ties to QC simply did not prejudice QC, given QC's clear and sufficient notice of the Amended Crossclaims.  The same is true of QC's contention—made for the first time at oral argument on November 28, 2023—that QC may have eventually changed away from this address in certain California state databases.

True, as QC notes, certain Third Circuit precedent indicates that actual "[n]otice to a defendant that he has been sued does not cure defective service," Grand Ent. Grp., Ltd., 988 F.2d at 492,  and that mere "[n]otice of a claim is not sufficient" to confer jurisdiction in some instances, Ayres v. Jacobs & Crumplar, P.A., 99 F.3d 565, 569 (3d Cir. 1996). 99 F.3d at 569; see also Kornea v. J.S.D. Mgmt., Inc., 336 F. Supp. 3d 505, 510 (E.D. Pa. 2018) (same); Lopez v. Sromovsky, No. CV 17-2183, 2018 WL 3957069, at *4 (E.D. Pa. Aug. 17, 2018) (citation omitted); Nally, 2023 WL 3674317, at *3 (distinguishing between "substantive challenge[s] to the method of service"

and technical deficiencies). But those cases do not fully grapple with the notion of minor "technical violations," Stranahan Gear Co., 800 F.2d at 56, reflecting a degree of formalism that has become disfavored over time.[13] Indeed, courts have long since abandoned the "the draconian action of dismissing claims based on technical failings that do not prejudice the defendant." Est. of Ginzburg by Ermey v. Electrolux Home Prod., Inc., 783 F. App'x 159, 161 (3d Cir. 2019) (citations omitted) (non-precedential). So this Court concludes that Guarantors' multiple good-faith efforts, in combination with QC's actual notice, were sufficient to effectuate service under the Federal Rules.

## B. Service was also Proper under Pennsylvania and California Law

Pennsylvania and California law support this result. The Pennsylvania Supreme Court has previously made clear that it will not "punish[] a plaintiff for technical [service] missteps where he has. . . suppl[ied] a defendant with actual notice" and thus "would dismiss only those claims where the plaintiffs have demonstrated an intent to stall the judicial machinery or where plaintiff's failure to comply with the Rules of Civil Procedure has prejudiced defendant." See McCreesh v. City of Philadelphia, 888 A.2d 664, 674 (Pa. 2005); Vessells v. Dipietro, No. 2105 C.D. 2010, 2011 WL 10858086, at *3 (Pa. Comm. Ct. Dec. 21, 2011) ("Once a party takes action on the merits of a case, he waives his right to object to defective service of process"); see also Kennedy v. Black,

---

[13] Moreover, certain portions of Grand Ent. Grp., Ltd. actually support a finding of proper service here. Indeed, the Third Circuit further held there that—to properly effectuate serve—a process-server must serve "either [] an individual with some direct connection to the party to be served or one whom the process server determines to be authorized, on the basis of her representation of authority, as evidenced by the affidavit of service." 988 F.2d at 486 (emphasis added). And here, as noted above, Canas's affidavit of service states that he served the papers "personally upon the defendant QC Labs" by leaving them with a "manager" at the relevant address. Based on that representation, along with Canas's earlier DLL-related efforts at the same location—which, again, QC held out in many ways to be a QC place of business—it was reasonable for Canas to determine that Speights was the manager of a QC place of business.

21

424 A.2d 1250, 1252 (Pa. 1981) ("While settlements are clearly favored and default judgments are

not, we do not believe the attempts in this case to negotiate a settlement can justify the appellees'

protracted delay in the filing of an answer."); Ruczynski v. Jesray Const. Corp., 326 A.2d 326, 328

(1974) (similar); O'Barto v. Glossers Stores, Inc., 324 A.2d 474, 476 (Pa.Super.1974) (similar).

That is why Pennsylvania courts have upheld service upon a "staff person at [defendant's]

former office location" who "represented herself to be an agent or person in charge at the office"

and then subsequently emailed the complaint to defendant's principal, Jones v. Innovative Prop.

Grp., LLC, No. 398 EDA 2017, 2017 WL 4861624, at *5 (Pa. Super. Ct. Oct. 26, 2017) (emphasis

added),[14] and upon a receptionist who conveyed that she was "in charge" of defendant's office,

Hopkinson v. Hopkinson, 323 Pa.Super. 404, 414–15 (1984).

Likewise, the California Supreme Court long ago held that statutes providing for service

of process "should be liberally construed to effectuate service and uphold the jurisdiction of the

court if actual notice has been received by the defendant, and in the last analysis the question of

service should be resolved by considering each situation from a practical standpoint." Pasadena

Medi-Ctr. Assocs. v. Superior Ct., 9 Cal. 3d 773, 778 (1973) (citation omitted); see also Fink v.

Moreno, Becerra & Guerrero, Inc., No. B178608, 2005 WL 1744963, at *5 (Cal. Ct. App. July 26,

2005) (similar); Scharf v. Scharf Invs., LLC, No. H050150, 2023 WL 4288389, at *5 (Cal. Ct.

App. June 30, 2023), reh'g denied (July 26, 2023), review denied (Sept. 20, 2023) (reaffirming

"Pasadena Medi-Center's call for a practical, situation-specific inquiry").   Indeed, the Ninth

Circuit has routinely held that "[s]o long as a party receives sufficient notice of the complaint, Rule

4 is to be liberally construed to uphold service."   Travelers Cas. & Sur. Co. of Am. v. Brenneke,

---

[14] Indeed, this case is quite similar to Jones, given that Speights conveyed to the process server
that she was the "manager" at an office that Guarantors aver was a former office for QC.

551 F.3d 1132, 1135 (9th Cir. 2009); <u>Chan v. Soc'y Expeditions, Inc.</u>, 39 F.3d 1398, 1404 (9th Cir. 1994) ("Rule 4 is a flexible rule that should be liberally construed to uphold service so long as a party receives sufficient notice of the complaint").

And so, again, this Court is convinced that QC's notice of Guarantors' Amended Crossclaims, coupled with Guarantors' multiple good-faith service efforts, sufficed to substantially satisfy each of the Federal Rules, the Pennsylvania Rules of Civil Procedure, and the California Code of Civil Procedure.  Accordingly, even if QC had not strategically declined to respond to Guarantors' Amended Crossclaims, bringing this case within the purview of <u>Wells</u>, this Court would still conclude—based on the "flexible" nature of service standards governing this case—that Guarantors properly effectuated service here.[15]

### C.  QC Cannot Demonstrate Excusable Neglect

QC's final "excusable neglect" argument does not alter this Court's conclusion, as it falls short for many of the same reasons <u>Wells</u> and <u>Walsh</u> govern this case.  As noted above, Rule 60(b)(1) provides that a "court may relieve party …. [f]rom a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect."  As also noted above, the Court relies on a three-factor test when assessing such a claim: "(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; and (3) whether the default was the result of the defendant's culpable conduct."  <u>Gold Kist, Inc.</u>, 756 F.2d at 19.  Ultimately, however, the "test for excusable neglect is equitable, requiring courts to consider the totality of the circumstances."  <u>Nara v. Frank</u>, 488 F.3d 187, 193 (3d Cir. 2007) (citations omitted).

---

[15] As such, QC's attempts to distinguish between Rule 60(b)(1) and Rule 60(b)(4), as the Third Circuit did in <u>Arpaio v. Dupre</u>, 527 F. App'x 108, 111 (3d Cir. 2013)(non-precedential), are unavailing and inapplicable here.

Here, the equitable considerations lead this Court to conclude that it must leave Guarantors' default judgment in-tact. Simply put, QC's culpability in bringing about this default judgment, in combination with the prejudice Guarantors would suffer if this Court were to vacate it, easily outweigh the potentially meritorious nature of any defense that QC might assert.

As this Court has already explained, QC has offered no valid excuse for its failure to respond to Guarantors' Amended Crossclaims. To the contrary, the record reflects that—at multiple points throughout this long and complicated litigation—QC actively weighed the benefits of not participating. So the vague excuse that QC now offers—that it was "not functional or operational as a company . . . at the time service was effected," ECF No. 63-2 at 25—rings hollow.[16] Indeed, at oral argument on November 28, 2023, this Court pressed QC's counsel for any further excuse QC might have had, but did not receive one. Accordingly, this Court is convinced QC's failure to respond was done "willfully," as QC has not provided "some reasonable basis for noncompliance within the time specified." Mark IV Transportation & Logistics, Inc. v. Lightning Logistics, LLC, No. CV 09-6480(ES), 2012 WL 12785037, at *3 (D.N.J. Dec. 5, 2012).

Likewise, QC's contention that Guarantors have not "show[n] actual prejudice . . . just delay," is unavailing. ECF No. 63-2 at 13. QC styles the harm as merely setting Guarantors back a "short period" of time, essentially rewinding this case to the moment before this Court's grant of Guarantors' motion for default judgment in May 2023. Id. at 19. But QC's framing here ignores that reopening this case after a year-and-a-half of litigation amongst intertwined parties—which has resulted in numerous settlements, likely contingent on this very default judgment—would undo

---

[16] If anything, this bolsters the validity of Guarantors' service efforts, as when a plaintiff has made a "good faith effort to locate the defendant through more direct means" but cannot do so, substituted service must merely be "reasonably calculated to give appellant actual notice of the instant suit." Romeo v. Looks, 369 Pa. Super. 608, 616–17 (1987).

an intricate web of progress and an unwind an otherwise final resolution.  This Court is not prepared to subject Guarantors, Third-Party Defendants, and potentially even DLL, to that outcome.

Lastly, QC's substantive challenges, while slightly more persuasive, cannot ultimately tip the scale back in its favor.  The crux of QC's argument here is that Lannon and Autera "executed personal guarantees" for the California lease "in their individual capacities and not as officers of QC labs, which does not entitle them to indemnification from QC labs." Id.  But that contention abstracts too far from reality.  While it is true that Lannon and Autera signed these agreements as "individuals," ECF No. 20-2 at 2–3, it is clear that Guarantors did so "by reason of their Corporate Status," ECF No. 20-1 at 34.  Said differently, it strains credulity to suggest that Lannon and Autera would have agreed to personally guarantee QC's lease had they not been officers of QC.

QC's further argument—that both the guaranty agreements and the broader indemnification agreement are subject to California choice-of-law and forum selection clauses— is similarly unavailing.  ECF No. 63-2 at 21; ECF No. 20-1 at 45–46; ECF No. 20-2 at 2–3.  Simply put, Pennsylvania courts have made clear that such clauses will not automatically preclude a default judgment.  See, e.g., Direct Cap. Corp. v. Claypoole, 273 A.3d 1025, 1025 (Pa. Super. Ct. 2022), reargument denied (Apr. 20, 2022) ("Because the defense is waivable, the existence of a forum-selection clause is not a 'defect' on the face of the record that precluded entry of the default judgment."); Aiyegbusi v. Knight, No. CIV.A.07-2766, 2008 WL 370619, at *2 (E.D. Pa. Feb. 7, 2008) (noting that "the parties' agreement as to the most proper forum should not receive dispositive weight," even if "it is entitled to substantial consideration").  Indeed, numerous courts have gone a step further, holding that a defendant's failure to appear—despite notice of a suit—necessarily waives that defendant's right to rely on a forum-selection clause.  See, e.g.,

Williams v. Life Sav. $ Loan, 802 F.2d 1200, 1202 (10th Cir. 1986)  ("Defects in venue are also waived if they are untimely asserted . . . . In addition, if a party is in default by failing to appear or to file a responsive pleading, defects in venue are waived, a default judgment may be validly entered and the judgment cannot be attacked collaterally for improper venue."); Hoffman v. Blaski, 363 U.S. 335, 343 (1960) ("[A] defendant, properly served with process by a court having subject matter jurisdiction, waives venue by failing seasonably to assert it, or even simply by making default"); Rogers v. Hartford Life & Acc. Ins. Co., 167 F.3d 933, 942 (5th Cir. 1999) ("a defendant in default waives any objection to venue"); Almog v. Golden Summit Invs. Grp., Ltd, No. CV1000602SVWPJW, 2012 WL 12867972, at *4 (C.D. Cal. Apr. 30, 2012) ("[B]y failing to appear in this action despite proper notice, Defendants have waived any potential defense based on the forum selection clauses"); Meadows v. Dominican Republic, 817 F.2d 517, 522 (9th Cir. 1987) ("Because appellants' neglect was inexcusable, we need not determine whether the record shows a meritorious defense or prejudice to the appellees").  So, the various forum-selection clauses here cannot save QC, particularly since QC has otherwise "failed to establish two of the three elements necessary to open a default judgment."  Claypoole, 273 A.3d at 1025.  In other words, because both culpability and prejudice weigh in Guarantors' favor, and the meritorious defense factor is neutral (if not adverse to QC), this Court concludes that QC cannot prevail on its excusable neglect argument.

## V.    CONCLUSION

In sum, this Court finds that (1) Guarantors properly effectuated service under the Federal Rules, Pennsylvania law, and California law, (2) QC strategically opted not to respond to Guarantors' claims, despite actual notice of this suit, and (3) QC cannot adequately demonstrate

excusable neglect for its failure to respond, and so this Court will **DENY** QC's motion to vacate the default judgment in favor of Guarantors and against QC.  An appropriate order follows.

O:\CIVIL 22\22-2512 Delage Landen Financial Services, Inc. v. QC Labs et al\22.cv.2512 Motion to Vacate Memo_12.15.23.docx